IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DARNELL T. HINES,** | 1:13 – CV – 0357  AWI JLT |
| **Plaintiff,** | |
| vs. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **ASHRAFE E. YOUSSEF, M.D., GODWIN C. JOSHUA GARZA, RNP, LYNN CARMICHAEL, R.N., BARBARA NEWKIRK, L.V.N. and DOES 1-10, inclusive,** | Doc. # 54 |
| **Defendants.** | |

In this action for damages for violation of rights guaranteed by the Eighth Amendment, defendants Ashrafe Youssef, M.D., et al. ("Defendants") have moved for summary judgment as to claims for relief alleged against all Defendants by plaintiff Darnell Hines ("Plaintiff"). Plaintiff is an African-American male who has had asthma all his life.  Plaintiff was incarcerated beginning on or about October 27, 2009, at the California Substance Abuse Treatment Facility at Corcoran  State Prison in Kings County, California ("SATFII").  While housed at the SATFII, Plaintiff contracted a disease called coccidiomycosis or "Valley Fever" which is caused by a fungus, Coccidioidies immitis, which is commonly present in soil and dust in semi-arid portions of the American South-West.  Plaintiff alleges his right to be free of cruel or unusual punishment under the Eighth Amendment was violated when he was incarcerated in an institution located in an area known to have a high probability or exposure to Valley Fever.  Federal subject matter jurisdiction exists pursuant to 28 U.S.C. §1331.  Venue is proper in this court.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff's FAC alleges a single claim for relief pursuant to 42 U.S.C. §1983 for violation of rights under the Eighth Amendment. Plaintiff alleges the named Defendants knew that Plaintiff was particularly susceptible to acquiring Valley Fever because of his race, African – American, and because of his status as a person with life-long asthma. Plaintiff alleges that Defendants, in endorsing Plaintiff for placement at the SATFII, were deliberately indifferent to substantial risk that Plaintiff would acquire Valley Fever and that Defendants' deliberate indifference was in violation of Plaintiff's Eighth Amendment rights. Following Defendants' answers to Plaintiff's FAC, the court issued a scheduling order setting the final date for amendment of the order for April 14, 2014. Plaintiff filed a motion on October 9, 2014 to further amend the complaint to add as defendants administrative officials responsible for promulgation of policies regarding valley fever exposure. That motion was denied by the Magistrate Judge on November 5, 2014. Plaintiff's motion for reconsideration was denied by this court on January 13, 2015 (hereinafter, the "January 13 Order"). Doc. # 53.

Defendants' motion for summary judgment (hereinafter, Defendants' "Motion") was filed on February 23, 2015. Plaintiff's opposition, which was filed on March 13, 2015, does not object to summary judgment as to Defendants Youssef and Garza. Although a number of contentions are advanced by Defendants in support of their motion for summary judgment, the court finds that Defendants' contention that they are entitled to qualified immunity as to any claims alleged by Plaintiff is sufficient to direct the court's determination on Defendants' motion. The court will therefore focus its attention on those facts proffered by either party that are relevant to the question of whether Defendants in this action are entitled to qualified immunity.

## DEFENDANTS' PROFFER OF UNDISPUTED MATERIAL FACTS

Whether the Defendants are entitled to qualified immunity is determinable on relatively few facts. An excellent source of background information is provided by Plaintiff at Exhibit "G" to the Declaration of Greg Garrotto, Doc. # 59-7. The exhibit consists of a report by California

Correctional Health Services dated October 2012 titled "Coccidiomycosis in California Department of Corrections and Rehabilitation Institutions" (hereinafter, the "Report"). The Report appends a document titled "Recommendations for Coccidiomycosis Mitigation in Prisons in the Hyperendemic Areas of California" by Dwight Winslow, MD, et al. (hereinafter, the "Winslow Report"), and a prior but undated study by Demosthenes Pappagianis, MD, titled "Coccidiomycosis in California Correctional Institutions" that originally identified the problem of epidemic levels of coccidiomycosis in California prison institutions. The following background facts are taken from the Report and are not disputed.

For purposes of the Report, the terms Coccidiomycosis, "cocci," or "Valley Fever," are synonyms for the disease cause by infection with Coccidioides immitis or Coccidioides posadasii. In the general population, infections are usually either asymptomatic or produce a .limited flu-like illness that is difficult to distinguish from other viral respiratory diseases. Serious, more disseminated disease occurs in about 10 percent of the infected population. Of individuals who develop disseminated cocci, about seventy to eighty percent exhibit symptoms of severe pulmonary disease. In about ten percent of individuals who develop disseminated infection, the disease involves organ systems other than the lungs including skin, skeletal or nervous systems. All disseminated forms of the disease are difficult to control, requiring long-term anti-fungal therapy, and can result in death. At the time relevant to this action, it was well established that risk factors for development of the more disseminated form of the disease include race or ethnicity (particularly African-American or Filipino), late term pregnancy, immunodeficiency conditions (including AIDS, organ transplant and immune-suppressive therapy) and certain listed chronic diseases, such a chronic obstructive pulmonary disease ("COPD") requiring oxygen therapy.

The study by Pappagianis quantified and characterized an outbreak of Coccidiomycosis that began in 2005 at Pleasant Valley State Prison ("PVSP"), which is located in Coalinga. The outbreak and PVSP coincided with the construction of a state hospital complex about 200 yards away from the prison. At the height of the outbreak at PVSP, the infection rate in the prison was

38 times the rate of infection in the citizens in the surrounding community.  The Pappagianis study compared rates throughout California and noted that the causative organism is endemic in most of the San Joaquin Valley and in the dryer portions of Ventura, Los Angeles, Orange, San Bernardino, Riverside and Imperial Counties.  The incidence of exposure to Coccidioidies immitis is highest, however, in the Central Valley portions of Kern, Tulare Fresno and Kings Counties.  The Report and the appended studies describe this latter area as "hyper-endemic" or "highly endemic."  The remainder of the area where the organism occurs is referred to as simply "endemic."  CDCR maintains a total of eight prisons in the hyper-endemic area.  These include PVSP, Wasco State Prison, Corcoran/SATFII, North Kern State Prison, Avenal State Prison, California Correctional Institution and Kern Valley State Prison.

The 2007 Winslow Report recommended that CDCR "[c]ontinue to exclude all of the following inmates from being housed in a facility that is in the hyper-endemic area including: HIV infected with a T-cell count less than 250, history of lymphoma; status post solid organ transplant; chronic [immunosuppressive] therapy (e.g. chronic rheumatoid arthritis); chronic lung disease requiring oxygen therapy; and cancer inmate-patient on chemotherapy."  Doc. # 59-7 at 32.  In addition, the Winslow Report recommended that the category of HIV infected inmates be expanded "in the near future" to include all HIV-infected inmates, not just those with low T-cell counts.  The Winslow Report also made the "near Future" recommendation for addition of inmates with "moderate and severe Chronic Obstructive Pulmonary Disease ("COPD").  Doc # 59-7 at 32.  There is no dispute that this list comprises all of the medical categories that were determined by CDCR to warrant exclusion of an inmate from a CDCR facility in the hyper endemic region at the times relevant to the complaint in this action. Although the papers by Pappagianis and Winslow do not appear to emphasize the issue of race as a factor in the development of disseminated cocci or recommend that race be a consideration in the exclusion criteria, the Report indicates that information from California Department of Public Health ("CDPH") associating African-American race with increased risk of disseminated disease was made known to CDCR by the time the 2007 exclusion criteria were determined.

It is not disputed that on June 8, 2009, Plaintiff was placed in custody at Wasco State Prison ("WSP"), which is a reception center where inmates are processed based on their sentence, custody factors, and medical condition. See Defendants' proffered Undisputed Material Fact ("UMF") # 4. It also not disputed that the determination of an inmate's placement was made by custodial staff, in this case by Defendant Aguirre, and that the decision was made in consideration of the inmate's "case factors, which include length of time to serve, arrest history, medical chromos, enemies, gang affiliation and emergency notifications." UMF # 7. Defendant's proffered UMF's numbered 9 through 14 pertain to Plaintiff's medical chronos[1] and the information that was or was not contained in them. The gist of Defendant's proffered UMF's 9 through 14 is that Defendant Aguirre, the individual most directly responsible for determining the placement of prisoners during the relevant time, relied primarily on medical chronos to determine whether there was a *medical* reason for placing or not placing an inmate at a certain institution. It is Defendant's contention that the medical chronos available to Aguirre that pertained to Plaintiff did not contain a determination for limitation of placement due to increased susceptibility to Valley Fever. Plaintiff, on the other hand, contends that "[w]hile Aguirre did not have the actual medical records, the chrono would contain very specific information about the inmate's medical condition." Doc # 57 at ¶ 9 (Opp.).

Somewhat confusingly, Plaintiff also contends that the "Medical Chrono as a form does not contain any of the exclusionary criteria that would have been in effect at the time of the Plaintiff's classification in July, 2009." Id. at ¶ 13 (Opp.). What the court interprets Plaintiff to mean by this is that the chrono or chronos that were pertinent to Plaintiff's medical condition at

---

[1] The court is not familiar with the term "chrono" as used in this case. From the context in which the word is used, and from an examination of evidence submitted in this and other cases, the court concludes that a "chrono" is both a standardized form and is also the information written on the form in much the same way as a medical prescription is both a piece of paper and the order that is written on the paper. Consistent with the "prescription" metaphor, the court understands that a medical chrono, is not the record of a medical examination, but is a form that conveys certain specific conclusions of the medical examination relating to issues like bunk assignment, provision of a walker or wheelchair, the presence of chronic illness, continuing medication requirements and the like. This interpretation of the term is not central to the discussion in this case, but it is useful in making sense of the Parties' disputes concerning UMF's 9 through 14.

the time of his classification did not *list* the specific criteria for exclusion of an inmate from institutions in the hyper endemic area (i.e. lymphoma, solid organ transplant, HIV, cancer chemotherapy, etc.), but did contain sufficient specific medical information about the inmate to allow the reviewer to know if the inmate *had* an organ transplant, HIV, cancer chemotherapy or any of the other exclusion criteria in effect at the time.

As the court understands Plaintiff's objections to Defendant's UMF's and Plaintiff's proffer of disputed material facts, it is Plaintiff's contention that: (1) the staff responsible for Plaintiff's medical evaluation knew that Plaintiff was African-American and that he had chronic asthma; (2) the information contained in chronos clearly transmitted those facts to Aguirre; and (3) the staff who medically evaluated Plaintiff were generally aware of the issue of valley fever in the prison system and were generally aware of the existence of exclusion criteria that had been developed and promulgated by the time Plaintiff was evaluated.  In addition, Plaintiff objects to Defendants' statement that in 2008, Defendant "Ugwueze was unaware that certain ethnic groups had a higher susceptibility to contracting [disseminated] Valley Fever." Doc. # 57 at ¶ 36.  It is Plaintiff's contention that the "Medical Staff with the Department of Corrections and Rehabilitation had awareness that certain ethnic groups would contract more severe forms of Valley Fever."  Id. (Plaintiff's Objection).

The court has reviewed Defendants' proffered UMF's, Plaintiff's objections and Plaintiff's disputed material facts and finds that items one through three listed in the above paragraph are supported by deposition testimony and are generally not disputed.  For purposes of the discussion that follows, the court also finds that Medical Staff with CDCR have been aware that susceptibility to disseminated coccidiomycosis is influenced to a significant extent by race and ethnicity and that it has been generally known and appreciated by CDCR that being African-American is a risk factor for the development of disseminated coccidiomycosis.  It is also not disputed that considerations of race and asthma were added to the list of exclusion criteria, at least with respect to some prisons in the hyper endemic zone, in 2013.

/ / /

## DISCUSSION

First, an observation. A Westlaw search of all federal decisions in the Ninth Circuit using the word string "Valley Fever" returns about 420 responses with case filings beginning around 1976. Up until 2005, there are relatively few cases (less than 50) and nearly all of the filings are cases using the word string in connection with Workers' Compensation claims. Beginning in 2005, the frequency of case filings increases dramatically and the typical type of case changes dramatically. Even a casual inspection of the listings from cases commenced in the last ten years shows that the overwhelming majority involve claims against state or federal correctional institutions in what has been termed the hyper-endemic cocci zone of the southern San Joaquin Valley. A very substantial majority of these cases have been filed in this district. Given the trend of ascending case filings without any obvious prospect of limitation, this court feels that efficient use of judicial resources counsels in favor of selecting grounds for determination of case outcome that are applicable at the earliest possible point in the proceedings. For the same reason, this court concludes it should favor grounds for decision that may be applied using the smallest set of objectively determinable rules. It is for this reason that the court in this case has decided to base its decision on Defendants' assertion of qualified immunity and has correspondingly determined that it should avoid if possible fact-specific inquiry into the roles of the individual Defendants.

Qualified immunity, when applicable, protects government officials from liability for civil damages. The purpose of qualified immunity is to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Messerschmidt v. Millender, — U.S. —, 132 S.Ct. 1235, 1244 (2012). To determine whether qualified immunity applies, the threshold question is whether, in the light most favorable to the party asserting

injury, the facts show an officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001)]; Robinson v. Solano County, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc). If no constitutional right was violated, immunity attaches and the inquiry ends. Saucier, 533 U.S. at 201. If a constitutional right would have been violated were a plaintiff's allegations established, the next step is to ask whether the right was clearly established in light of the context of the case. Id. Finally, the contours of the right must be clear enough that a reasonable officer would understand whether this or her acts violate that right. Id. at 202.

To a significant extent the court's determination of Defendants' assertion of qualified immunity is prefigured by the court's discussion in the court's January 13 Order denying Plaintiff's motion for reconsideration of the Magistrate Judge's denial of Plaintiff's motion for leave to amend. In the January 13 Order, the court stated the necessary elements of an Eighth Amendment claim in the context of conditions of confinement as follows:

> In the context of conditions of confinement, "Prison officials violate the Eighth Amendment if they are 'deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs.' Estelle v. Gamble, 429 U.S. 97, 104 (1976)." Peralta v. Dillard, 744 F.3d 1076, 1081 (9th Cir. 2014). This standard contains both an objective and subjective element. See Helling v. McKinney, 509 U.S. 25,35-36 (1993) (discussing objective and subjective elements of Eighth Amendment Claim). In the context of exposure to disease, the objective element asks whether prison officials have exposed the prisoner to a serious medical risk of disease. To determine whether the medical risk to which the plaintiff is exposed is *serious*, the court considers whether the "risk the prisoner complains of [is] so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id. at 36 (italics in original). [¶] The subjective element of an Eighth Amendment Violation asks whether the prison official acted with "deliberate indifference" in denying the medical care or exposing the prisoner to the risk of disease. For conduct to qualify as "deliberately indifferent" in the context of conditions of confinement, the conduct must be shown to be "wanton." To determine if conduct is wanton, the court inquires into the "the constraints facing the *official*." Wilson v. Seiter, 501 U.S. 294, 303 (1991). A depravation of a treatment or the exposure to a hazard may be *wanton* only if it was within the official's ability at the time to avoid the exposure to risk or deprivation of care. "Wantonness consist[s] of 'acting sadistically and maliciously for the purpose of causing harm.' [Citation.]" Id. (quoting Whitley v. Albers, 475 U.S. 312, 321-322 (1986).

Doc. # 53 at 5:13-6:6.

At the outset it is important to recognize that since 2002, the ability of the California prison system to provide constitutionally sufficient mental, dental and medical care to its inmates has been a matter of review and, eventually, of supervision by federal courts. In terms of medical care, CDCR stipulated to a consent decree based on a finding of constitutionally deficient medical care in 2002. CDCR's inability to implement the consent decree resulted in the placement of medical care in the California prison system under a court-appointed receiver in 2006. See Plata v. Brown, 754 F.3d 1070, 1079 (9th Cir. 2014) ("Plata") (case appendix providing timeline for various events from 2001 when the class action was filed to 2013 when the order under review was filed). During the period of receivership, Plata has been the judicial vehicle by which a number of improvements to medical care in the California prison system, among them control of exposure to Coddicioidies immitis, have been pursued. Some of the case authority that emanates from Plata imparts the distinct impression that the both the state defendants and the inmate plaintiff parties have experienced frustration and difficulty in dealing with their differing opinions regarding the proper balance of expense, efficacy and timeliness. This difficulty is particularly evident in Plata v. Brown, 2013 WL 3200587 (N.D. Cal. June 24, 2013) in which the court issued an order granting plaintiff's motion for the implementation of exclusion criteria to limit exposure to Coccidioidies immitis at PVSP and Avenal State Prison. This court finds much that is instructive in this order from the Northern District and will refer to the order and the discussion in it as Plata II.

As noted previously, the case at bar is an action for *damages* arising from an alleged failure to provide care. This is the fundamental distinction between the case at bar and the case authority that has emanated from the class action in Plata, which is confined to efforts to achieve injunctive relief to prevent or treat disease or medical conditions. Qualified immunity applies in actions for damages but not in actions for injunctive relief. Notwithstanding this distinction

between the orders that have emanated from Plata and the case at bar, the court finds for the following reasons that the court's order in Plata II informs the extent of qualified immunity in cases such as the one at bar which seek damages resulting from the alleged failure to provide care.

At the time the outbreak of Valley Fever was noted at PVSP in 2005, the consent decree between the parties in Plata had been entered into and the Plata court was aware of the failure of CDCR to implement any of the mitigations that had been stipulated to. The following year the court-appointed receiver requested that California Department of Public Health ("CDPH") conduct an investigation at PVSP. Plata II, 2013 WL 3400587 at *3. The product of the ordered investigation by CDPH was the previously-cited Winslow Report which was provided to the receiver in June of 2007. The Winslow Report made a total of 26 recommendations. Many of the recommendations were not adopted by CDCR due to concerns regarding cost and effectiveness. Id. at *4. However, CDCR did adopt exclusion criteria to prevent exposure of identified groups to cocci spores and applied those criteria to all the state prisons in the hyper-endemic area. As previously noted, the criteria adopted by CDCR excluded inmates with (1) HIV infection, (2) history of lymphoma, (3) status post solid organ transplant (4) Chronic immunosuppressive therapy (such as for rheumatoid arthritis), (5) moderate to severe chronic COPD requiring continuous or intermittent oxygen therapy, (6) cancer on chemotherapy. Id.

As is apparent from the foregoing list, CDCR did not include considerations of race or chronic asthma to be criteria for exclusion in 2007. It is significant for purposes of this discussion that the criteria for exclusion that were adopted by CDCR in 2007 were the same as the criteria recommended for immediate and "near future" use by CDPH in the Winslow Report and are identical to those listed in the preceding paragraph. See Doc. # 59-7 at 32 (listing recommended exclusion criteria for implementation at PVSP). Thus, the available evidence

indicates that, notwithstanding any foot-dragging that may have occurred prior to 2007, CDCR sought out expert recommendations on how to control the incidence Valley Fever at PVSP and ASP, and then applied the recommendations *pertaining to inmate exclusion* to all the prisons in the hyper-endemic area.

In order to assess the effectiveness of the recommended mitigation measures, the Public Health and Quality Management Units of the California Correctional Health Care Services ("CCHCS") carried out the review presented in the 2012 Report ("Coccidiomycosis in California's Adult Prisons 2006 – 2010). The Northern District Court's order in Plata II indicates that Public Health and Quality Management Units of the CCHCS were under the control of the court-appointed Receiver at the time the Report was issued. See Plata II, 2013 WL 3200587 at *5. The Plata II court noted that the Report found that the rates of coccidiomycosis in PVSP, Avenal and Wasco State Prison had not declined during the study and remained substantially higher than the corresponding rates in their surrounding communities and that mitigation strategies that had been adopted in 2007 were not sufficient. The Plata II court noted that CDCR, spurred to seek further assistance by the dismal results noted in the Report, formally requested assistance form CDPH. Of significance, the District Court noted that CDPH concluded:

> *The populations/groups at risk for severe cocci factor can be addressed by reducing the number of inmates belonging to these groups in these prisons.* The reality that the state prisons are already crowded means that moving all at-risk inmates out of these prisons is difficult and may not be feasible, but some further screening out of some high risk groups is advisable . . . . *Further analyses of current data will likely show similar findings of these populations/groups at risk for severe disease as documented in past publications, and therefore it is probably of little additional value to carry out further data analysis to identify or clarify risk groups in these prisons at this time.* . . .

Id. at *7 (italics added by the Plata II court).

In a similar vein, the CCHCS Report noted that:

> The group with the most disproportionate impact are African Americans; they make up only 29% of the total population and only 25% of the population at PVSP but 50% of those with disseminated disease and 71% of the deaths are among African Americans.  Using these groups to identify patients to exclude form the cocci endemic area is problematic because they make up a substantial proportion of the CDCR population and even if they were excluded, high rates of cocci hospitalizations, and disseminated disease would be expected to occur among those had not been excluded.

Doc. # 59-7 at 25.

Thus, both the CDPH "Expert's Report" and the Receiver's CCHCS Report address the issue of using race-based categories in determining populations to exclude from at least the two highest-incidence prisons (PVSP and Avenal) and simultaneously noted that the application of race as an exclusion criterion could have at least logistical difficulties.  CDCR, the defendant in Plata II, sought to delay implementation of any additional exclusion criteria pending the outcome of further information gathering and recommendations by the Centers for Disease Control.  The District Court firmly rejected this approach noting:

> Perhaps at one point, Defendants' wait-and-see approach might have been reasonable.  Under current conditions, however, they are not.  As the court expert concluded, "[w]hile it is important to involve the public health expertise of the CDC to provide further guidance, given the ongoing morbidity and mortality form cocci, further postponement of previously made public health recommendations shows a callous disregard for patient health and safety." Expert Report at 12.  An exclusion policy is now the only reasonable response[.]

Plata II, 2013 WL 3200587 at *12.  The Plata II court concluded by ordering that the receiver adopt and implement an exclusion criteria set that includes the categories "consistent with the factors identified by the American Thoracic Society as creating a risk of severe cocci." Id. at *14.  It should be kept in mind that the order in Plata II that added considerations of race and ethnicity, asthma and the presence of diabetic disease to the exclusion criteria was in response to a motion that pertained only to PVSP and Avenal prisons.  The application of these criteria to other prisons in the hyper-endemic zone appears to have been undertaken by CDCR in 2013 in

the absence of a court order.

For purposes of determining whether qualified immunity applies to the alleged act of the individual Defendants, several features of the District Court's order in Plata II are instructive. First, it is instructive to note that between 2005 and 2012, when the CDPH filed its report and recommendations, it was known that certain racial or ethnic groups had greater susceptibility to the development of disseminated coccidiomycosis, but there is no evidence that the magnitude of that increased susceptibility, in comparison to the other risk factors, was fully appreciated. The lack of hard data showing that exclusionary criteria that stop short of inclusion of racial categories would be insufficient to make a difference in disease rates is sufficient to explain why there was no recommendation from any CDPH or any other authoritative source to apply racial category criteria to the list of exclusions during that time. Second, the Northern District's Order in Plata II provides a window onto the tension between cost, logistic practicality and efficacy that was an on-going part of the determination of what strategies for disease reduction could be required to constitutionally minimum requirements.

Third, and perhaps most fundamentally, it must be recognized that during the entirety of the time in which Plaintiff's claims, and the claims of many other inmates who suffered the results of exposure to cocci arose, the policy decisions regarding inmate medical care have been mostly or wholly placed in the hands of the court-appointed receiver; and had become the topic of actions, past and present, in the District Court of Northern California. As exemplified by the Northern District's Order in Plata II, the District Court has become a, if not *the*, significant arbiter of whether a certain policy defines practices that are within Eighth Amendment bounds.

As the Plata II court pointed out, deliberate indifference is determined in consideration of the Defendant's conduct at the time giving rise to the complaint, not in consideration of what has transpired in the past. See id. at *10 n.3 (citing Farmer v. Brennan, 511 U.S. 825, 845-46

(1994)). Thus, it is not relevant to Plaintiff's claims that the State's intransigence is why medical care in California's prison system was placed in the hands of a receiver in the first place. What is relevant is whether the Defendants' actions at the time of the actions giving rise to the plaintiff's complaint were taken with deliberate indifference to Plaintiff's medical needs. Thus, although the various court orders and decisions pertaining to Plata seem to suggest an attitude by CDCR that boarders on obstructionist at times, there is no information to suggest that Plaintiff was in any way a victim of intentional delay during the time period relevant to this action (2006 through 2012).

As previously noted, even if a defendant's conduct violates the Eighth Amendment, a matter the court has chosen not to address, the defendant is entitled to qualified immunity if either (1) the right was not clearly established in light of the context of the case; or, (2) a reasonable officer would not have understood whether this or her acts violate that right. Saucier, 533 U.S. at 201-202. What the foregoing discussion establishes is that, in the context of the application of criteria for exclusion from endorsement to prisons in the cocci hyper-endemic zone in 2008, the right to exclusion on account of any factors not previously recommended by an authoritative source or ordered by the receiver prior to the time of endorsement was not clearly established. Alternatively, it is clear to this court that any reasonable state actor would have known that from 2002 onwards, authority to set policies pertaining to medical care, including exclusion from cocci-endemic areas, had been placed in the hands of the court and its appointed receiver. It follows that those working under policies and procedures promulgated or approved by the District Court or its appointed receiver had and continue to have a right to rely on those reviewed and/or promulgated policies as being constitutionally sufficient. Thus, a reasonable officer acting in accord with policies approved and/or promulgated by the court or its appointed receiver would have no reason as a matter of law to understand his or her actions could violate

any constitutional right.

In this case, the undisputed facts show that in 2008 when Plaintiff was housed at Wasco State Prison and when Plaintiff was endorsed for transfer to SATFII the question of whether he should be excluded from housing at SATFII on account of his race and condition of chronic asthma had been considered by authoritative sources including CDPH, and that, consistent with recommendations from CDPH, neither the receiver nor CDCR included or recommended the inclusion of African American race or chronic asthma as exclusionary criteria.  Because the categories of race and other forms of respiratory compromise had been considered and not adopted as exclusionary criteria, the court finds the right to exclusion from placement in the hyper-endemic zone was not clearly established at the time.  Correspondingly, the court finds that a reasonable officer would not have understood that in endorsing Plaintiff for transfer to SATFII she would be violating a constitutionally guaranteed right.

The court therefore finds all Defendants in this action are entitled to qualified immunity and that all claims against them must be dismissed.


THEREFORE, it is hereby ordered that all claims alleged in Plaintiff's FAC against all Defendants are hereby DISMISSED with prejudice.  The Clerk of the Court shall CLOSE the CASE.


IT IS SO ORDERED.

Dated:   May 18, 2015                                     _____
                                                                            SENIOR  DISTRICT  JUDGE

-15-